1998 SD 46

Mary WRIGHT, Gorgie Paulhamus, Estelle Lone Hill, Carroll C. Swan, Bryant High Horse, Jr., and Pearl Lyon, Plaintiffs and Appellees,

v.

Melbert PRAIRIE CHICKEN, Marilyn Prairie Chicken, Chuck Davis, Florence Janis, Melvin Miner, Toni Montileaux and Robert Chasing Hawk, Defendants and Appellants.

No. 20424.

Supreme Court of South Dakota.

Considered on Briefs May 12, 1998.

Decided May 13, 1998.

William M. Rensch, Rapid City, for plaintiffs and appellees.

Thomas W. Stanton and Frank Driscoll of DeMersseman Jensen LLP, Rapid City, for defendants and appellants.

PER CURIAM.

[¶ 1.]Melbert Prairie Chicken *et al.* [collectively referred to herein as Defendants], members of the board of directors of the Rapid City Indian Health Board, appeal from an order granting summary judgment to Mary Wright *et al.* [collectively referred to herein as Plaintiffs], members-elect of the board, in an action arising from an election contest.

## FACTS

[¶ 2.]The Rapid City Indian Health Board (Board) makes and administers contracts with the federal government to provide health services on behalf of the Cheyenne River Sioux Tribe, Oglala Sioux Tribe, and Rosebud Sioux Tribe. The Board is governed by eleven elected directors and three appointed by the three tribes. Members of the Board must be of Indian descent, be twenty-one years of age, and have lived within the boundaries of the Public Health Service Unit of Rapid City for a period of six months. The directors serve staggered two-year terms and an annual election is held to fill expired terms and vacancies. The eligibility of persons elected on October 28, 1997 to serve on the Board and internal procedures for filing election protests are the issues at the heart of the dispute underlying this appeal.

[¶ 3.]The six highest vote-getters in the October 1997 election are the Plaintiffs and Appellees: Mary Wright, Gorgie Paulhamus, Estelle Lone Hill, Carroll C. Swan, Bryant High Horse, Jr. and Pearl Lyon. A protest was filed after the election by an unsuccessful candidate for Board membership challenging the qualifications of Wright, Paulhamus, Swan, and Lyon to sit as Board members. The protest claimed that Wright, Paulhamus and Lyon owed money to the Board and that Swan was a convicted felon. Either of these deficiencies would preclude Board membership according to the Voter Handbook.

[¶ 4.]It was questioned whether the protest was filed in compliance with the Board's election protest procedures. Board sought an opinion from its legal counsel. Board sought a second legal opinion, apparently after some Board members expressed dissatisfaction with the first opinion. The second opinion recommended seating none of the elected candidates and holding a new election. Following this recommendation, Plaintiffs began the suit underlying this appeal. The Board brought the matter to an administrative hearing officer, hoping to achieve an expeditious resolution to the matter. The hearing officer proposed his conclusions that the October 1997 election should not be set aside and that all six elected candidates should be seated. The Board did not act on this proposed decision.

[¶ 5.]Plaintiffs' lawsuit requested a declaratory judgment that they be seated as Board members claiming the protest was not filed in compliance with the Board's election protest procedures. They sought compensatory and punitive damages and named seven members of the current Board as Defendants: Melbert Prairie Chicken, Marilyn Prairie Chicken, Chuck Davis, Florence Janis, Melvin Miner, Toni Montileaux and Robert Chasing Hawk. Of these Defendants, three are members whose terms expired in September 1997 but who refuse to stand down. Four of the Defendants are "carry-over" members whose terms will expire in September 1998. All have voted against Plaintiffs' efforts to be seated on the Board.

[¶ 6.]Plaintiffs' initial motion for summary judgment was denied, and expedited discovery ordered so that the matter could be set for trial. Plaintiffs renewed their motion which was heard the day of trial and granted

by the trial court. The court ordered the members-elect to be seated on the Board. Plaintiffs' claim for compensatory and punitive damages was denied. Defendants' subsequent motion to stay enforcement of the judgment was granted for a limited period of time. Plaintiffs' motion to quash the stay was denied and Defendants appealed the order granting summary judgment. This Court agreed to consider the appeal on an expedited basis. Defendants raise two issues: 1) whether the trial court lacked subject matter jurisdiction; and 2) whether the trial court erred in granting summary judgment to Plaintiffs.

## DECISION AND ANALYSIS

### 1. Jurisdiction

 [¶ 7.]It is well settled that Indian tribes generally enjoy a common-law immunity from suit. *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58, 98 S.Ct. 1670, 1677, 56 L.Ed.2d 106, 115 (1978); *United States v. United States Fidelity & Guaranty Co.*, 309 U.S. 506, 60 S.Ct. 653, 84 L.Ed. 894 (1940). This tribal sovereign immunity has been extended to tribal officers acting in their representative capacities and within the scope of their authority. *Hardin v. White Mountain Apache Tribe*, 779 F.2d 476, 479 (9th Cir. 1985). Defendants claim tribal sovereign immunity extends to protect them through their membership on the Rapid City Indian Health Board.

[¶ 8.]The Board is a private nonprofit corporation chartered in 1972 by the State of South Dakota.[1] According to its Voter Handbook, it is "authorized to operate contract health care programs by three local Tribes, the Cheyenne River Sioux Tribe, the Oglala Sioux Tribe and the Rosebud Sioux Tribe." As identified in the Handbook, the Board's main purpose is "the promotion of health care and operation of quality health care programs for Indian people."

[¶ 9.]To effect this purpose, the Board contracts with the Department of Health and Human Services of the federal government through Self–Determination Contracts. 25 U.S.C. § 450; Appendix A of Defendants' Appellate Brief. The contracts refer to the Board as "the Rapid City Indian Health Board tribal government or tribal organization." By operation of statute authorizing the contracts, Defendants claim the Board is a tribal organization:

> The Secretary is directed, upon the request of any Indian tribe by tribal resolution, to enter into a self-determination contract or contracts *with a tribal organization* to plan, conduct, and administer programs or portions thereof. . . .

25 U.S.C. § 450f(a)(1)(1997) (emphasis added). "Tribal organization" is defined as:

> the recognized governing body of any Indian tribe; any legally established organization of Indians which is controlled, sanctioned, or chartered by such governing body or which is democratically elected by the adult members of the Indian community to be served by such organization and which includes the maximum participation of Indians in all phases of its activities. . . .

25 U.S.C. § 450b(1)(1997).

[¶ 10.]However, assuming *arguendo* the Board is a tribal organization, it does not automatically follow that it enjoys the same sovereign immunity as the tribes it serves.

> Although no set formula is dispositive, in determining whether a particular tribal organization is an 'arm' of the tribe entitled to share the tribe's immunity from suit, courts generally consider such factors as whether: the entity is organized under the tribe's laws or constitution rather than Federal law; the organization's purposes are similar to or serve those of the tribal government; the organization's governing body is comprised mainly of tribal officials; the tribe has legal title or ownership of property used by the organization; tribal officials exercise control over the administration or accounting activities of the organization; and the tribe's governing body has power to dismiss members of the organization's governing body. More impor-

---

1. Formerly known as the Rapid City Indian Health Service Unit Advisory Board, the Board changed its name in 1991.

tantly, courts will consider whether the corporate entity generates its own revenue, whether a suit against the corporation will impact the tribe's fiscal resources, and whether the subentity has the 'power to bind or obligate the funds of the [tribe].' The vulnerability of the tribe's coffers in defending a suit against the subentity indicates that the real party in interest is the tribe.

*Ransom v. St. Regis Mohawk Educ. & Comm. Fund., Inc.*, 86 N.Y.2d 553, 635 N.Y.S.2d 116, 119–20, 658 N.E.2d 989, 992–93 (1995) (*quoting Altheimer & Gray v. Sioux Mfg. Corp.*, 983 F.2d 803, 809 (7th Cir.1993), *cert. denied* 510 U.S. 1019, 114 S.Ct. 621, 126 L.Ed.2d 585); *see* William V. Vetter, *Doing Business with Indians and the Three "S"es: Secretarial Approval, Sovereign Immunity, and Subject Matter Jurisdiction*, 36 Ariz. L.Rev. 169, 176–77 (1994). There is no record that evidence concerning the factual questions raised by the above factors was presented to the trial court although the trial court necessarily considered some of these factors in the material it reviewed to determine jurisdiction.[2]

[¶ 11.]Regarding the individual factors themselves, it appears a finding under the first factor, whether the entity is organized under the tribe's laws or constitution rather than the federal law, would weigh against Defendants' claim since the Board is organized under South Dakota's corporation laws. However without factual findings made on the record, it is impossible to accept Defendants' argument and state that the Board is so closely aligned with and dependent upon the tribe that it is entitled to the protection of tribal sovereign immunity.

■ [¶ 12.]The above discussion notwithstanding, jurisdiction in this case was based on the trial court's conclusion that Plaintiffs had sued Defendants in their individual capacities. The defense of sovereign immunity may not be evaded simply by suing officers in their individual capacity. *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949);

*Hardin*, 779 F.2d at 479 (noting this principle of law extends to tribal officers). In determining whether a suit against an individual was actually a suit against the sovereign, *Larson* provided the following analysis:

If the denomination of the party defendant by the plaintiff were the sole test of whether a suit was against the officer individually or against his principal, the sovereign, our task would be easy. Our decision then would be that the United States is not being sued here because it is not named as a party. This would be simple and would not leave room for controversy. But controversy there has been, in this field above all others, because it has long been established that the crucial question is whether the relief sought in a suit nominally addressed to the officer is relief against the sovereign. In a suit against the officer to recover damages for the agent's personal actions that question is easily answered. The judgment sought will not require action by the sovereign or disturb the sovereign's property. There is, therefore, no jurisdictional difficulty. The question becomes difficult and the area of controversy is entered when the suit is not one for damages but for specific relief: *i.e.*, the recovery of specific property or monies, ejectment from land, or injunction either directing or restraining the defendant officer's actions. In each such case the question is directly posed as to whether, by obtaining relief against the officer, relief will not, in effect, be obtained against the sovereign. For the sovereign can act only through agents and, when an agent's actions are restrained, the sovereign itself may, through him, be restrained. As indicated, this question does not arise because of any distinction between law and equity. It arises whenever suit is brought against an officer of the sovereign in which the relief sought from him is not compensation for an alleged wrong but, rather, the prevention or discontinuance, *in rem*, of the wrong. In each such case, the compulsion, which the court is asked to impose, may be

---

2. The trial court stated it carefully reviewed Defendants' submitted authority, this Court's opinion in *Ford v. Moore*, 1996 SD 112, 552 N.W.2d 850, as well as the Board's bylaws and articles of incorporation before announcing its jurisdiction over the election dispute.

compulsion against the sovereign, although nominally directed against the individual officer. If it is, then the suit is barred, not because it is a suit against an officer of the Government, but because it is, in substance a suit against the Government over which the court, in the absence of consent, has no jurisdiction.

337 U.S. at 687–88, 69 S.Ct. at 1460–61, 93 L.Ed. 1628.

[¶ 13.]Pursuant to the *Larson* analysis, this suit was one against Defendants as individuals rather than in their official capacities and therefore the trial court properly invoked subject matter jurisdiction. Attorney for Defendants, whose argument relies heavily on claimed immunity through the Board's status as a tribal organization, informed the trial court that the Board was not a party to the action and that he was not representing the Board. "Tribal immunity does not extend to the individual members of the tribe." *United States v. James*, 980 F.2d 1314, 1319 (9th Cir.1992) (citing *Puyallup Tribe, Inc. v. Washington Game Dep't*, 433 U.S. 165, 173, 97 S.Ct. 2616, 2621, 53 L.Ed.2d 667 (1977)). Moreover, the underlying dispute involves not the Board's mission of providing health care to Indian people, but an election contest between elected candidates and current directors for Board membership and whether internal procedures for filing election protests was followed. "The judgment sought will not require action by the sovereign or disturb the sovereign's property." *Larson, supra.* Based on this record, the court had jurisdiction.

## 2. Summary Judgment

[¶ 14.]The trial court granted Plaintiff's motion for summary judgment after determining the Board's election protest procedure was not followed and after finding there existed no genuine issue of material fact. The election protest procedure provides:

> Only candidates for Election to the RCIHB Board of Directors have standing to protest the election. Candidates have seven (7) calendar days from the election day to protest the election. The written protest must be submitted in writing to the full Election Committee. It shall not be considered submitted if the written protest is delivered to any executive officer or employee of the Board. The Election Committee shall make the final determination on the validity of the Protest. The Election Committee shall respond in writing to any protest within seven (7) calendar days of the receipt of the protest unless, for good cause shown, additional time is required by the Election Committee. In this case, the Election Committee must notify the Candidate as soon as possible that there will be a delay, the reason for the delay, and the expected length of the delay. All effort must be made to resolve the protest as soon as possible.

Rapid City Indian Health Board, Voter Handbook, September 1997 Revision. The protest involved allegations that three of the members-elect owed money to the Board and that one, Carroll Swan, was a convicted felon.[3] According to the Voter Handbook, these deficiencies, if true, would preclude membership on the Board.

[¶ 15.]A protest was brought by candidate Kenneth Richards, Sr. who had not received sufficient votes to win a seat on the Board at the October 28, 1997 election. The facts show Richards attended a Board meeting on November 3 and handed an envelope containing a copy of his protest for each member of the Board to Melbert Prairie Chicken. Melbert was then a member of the Election Committee, but not acting chairman as Defendants assert on appeal.[4]

---

**3.** In light of his felony conviction, Swan volunteered to step down and Faith Lee, the next highest vote-getter, was appointed to take his place. This procedure complies with the Voter Handbook.

Also, the Election Committee was aware of the allegations that three candidates owed money to the Board at the time they submitted their candidate petitions. In late October 1997, prior to the election, this Committee considered the issue of whether the three owed money and after consideration, declared all three qualified as Board member candidates.

**4.** Elaine Delores, Chairperson of the Election Committee had designated Prairie Chicken as temporary acting chairman while she was gone from October 25 to October 30, 1997. She returned to her post October 31.

[¶ 16.]The next day was November 4 and the last day to file a protest according to the Voter Handbook. On that day, Richards attended a scheduled Election Committee meeting and handed each Committee member present his written protest. However, because only two Committee members were in attendance at this meeting, there was no quorum and the business of Richards' protest was not addressed. There is no claim or evidence Richards ever presented his protest in writing to all the Election Committee members within the seven-day period.

[¶ 17.]Plaintiffs argued before the trial court that Richards' protest was never submitted to the full Election Committee within the seven-day period following the election pursuant to Voter Handbook requirements. Defendants conceded there was not literal compliance with the protest procedure and complained about the difficulty of compliance with the procedure as written. The trial court granted summary judgment to Plaintiffs, acknowledging the apparent difficulty but finding the protest had not been handled in accordance with the Board's own procedures. While the trial court or this Court may find such procedures do not provide the most efficient avenue for protest, the limitations or guidelines must come from the Board and not the courts.

 [¶ 18.]It is settled law that a corporate election will not be set aside unless there is a showing of fraud or illegality. 19 CJS *Corporations* § 439 (1990). The allegations made by Defendants that some of the members-elect are not qualified to hold office is not sufficient reason to upset the trial court's order granting summary judgment. This Court has previously stated "[t]he basic question in an election contest is whether the election is a free and fair expression of the will of the voters despite the irregularities." *Abbott v. Hunhoff,* 491 N.W.2d 450, 452 (S.D. 1992) (citing *Larson v. Locken,* 262 N.W.2d 752, 753 (S.D.1978)). "It is not the policy of the law to disenfranchise voters because of an election official's mistakes, negligence or misconduct." *Id.; see also In re Election of Officers and Directors of F.I.G.H.T., Inc.,* 79 Misc.2d 655, 360 N.Y.S.2d 564, 568 (N.Y. 1974) (refusing to interfere, absent a clear showing which would warrant it, with the "internal affairs" of a nonprofit corporation in an election in which it was alleged some elected candidates were not qualified to hold office). Even if the Election Committee was mistaken in certifying any of the candidates as qualified, this does not rise to the level of fraud or illegal conduct.

[¶ 19.]Finding no genuine issue of material fact and no error of law, we affirm.

[¶ 20.]MILLER, C.J., and SABERS, AMUNDSON, KONENKAMP, and GILBERTSON, JJ., participating.

