[No. D060868. Fourth Dist., Div. One. May 24, 2012.]

AMERICAN PROPERTY MANAGEMENT CORPORATION, Petitioner, v. THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent; U.S. GRANT HOTEL VENTURES, LLC, Real Party in Interest.

**COUNSEL**

Boudreau Williams and Jon R. Williams for Petitioner.

No appearance for Respondent.

Procopio, Cory, Hargreaves & Savitch, Anthony J. Dain, Frederick K. Taylor and Heather A. Cameron for Real Party in Interest.

**OPINION**

**IRION, J.**—The petition for writ of mandate filed by American Property Management Corporation (APMC)[1] challenges the trial court's ruling that the cross-complaint against U.S. Grant Hotel Ventures, LLC (U.S. Grant, LLC)—a limited liability company organized under California law—is barred by tribal sovereign immunity because of U.S. Grant, LLC's relationship with the Sycuan Band of the Kumeyaay Nation (Sycuan), a federally recognized Indian tribe.

We conclude that APMC is entitled to writ relief. U.S. Grant, LLC, is not an arm of the tribe protected by Sycuan's sovereign immunity. Accordingly we will direct a writ of mandate to issue requiring the superior court to vacate its order dismissing the cross-complaint against U.S. Grant, LLC.

I

FACTUAL AND PROCEDURAL BACKGROUND

In 2003, Sycuan Tribal Development Corporation (STDC), a corporation chartered under Sycuan's tribal laws, invested in the purchase of the U.S. Grant Hotel in downtown San Diego (the hotel) but created several layers of California limited liability companies to stand between it and the entity that took ownership of the hotel.

Specifically, U.S. Grant, LLC—a California limited liability company—purchased the hotel in 2003. U.S. Grant, LLC, is wholly owned by its sole member Sycuan Investors—U.S. Grant, LLC (Sycuan Investors, LLC), a California limited liability company. Sycuan Investors, LLC, in turn, is wholly owned by its sole member American Property Investors—U.S. Grant, LLC (American Property Investors, LLC), a California limited liability company. American Property Investors, LLC, is wholly owned by its sole member STDC. All three limited liability companies were organized in late 2003 in connection with the transaction to purchase the hotel.

---

[1] The writ petition was filed by APMC, but this lawsuit also involves two related parties—APMC San Diego Hotel Management, LLC, and Michael Gallegos—who filed the cross-complaint that is the subject of the dismissal order challenged in this writ proceeding. As U.S. Grant Hotel Ventures, LLC, has not challenged APMC's standing to file the writ petition, and the writ petition refers to "APMC (and related entities)," we will treat the writ petition as having been filed by APMC, APMC San Diego Hotel Management, LLC, and Gallegos collectively. When describing the arguments asserted in this writ proceeding, we will refer to those three parties together as "APMC."

STDC is a corporation that was created under Sycuan's own tribal laws in 1990, rather than under the laws of any state. As stated in its articles of incorporation, STDC's overall purpose is "the enhancement of the welfare of [Sycuan] through the acquisition and development of real and personal property, investment of funds and all other lawful activities appropriate to such purpose." Eligible enrolled members of Sycuan are shareholders in STDC.

According to deposition testimony of Sycuan's controller, STDC invested $18 million toward the purchase of the hotel. Although the record does not specifically reflect the structure of the transaction by which STDC invested in the hotel, we infer that it was accomplished through the capitalization of American Property Investors, LLC, when STDC organized that entity in December 2003 for the purpose of acquiring the hotel.[2] STDC acted as one of the guarantors of the $31 million bank loan that U.S. Grant, LLC, obtained to purchase and renovate the hotel,[3] but U.S. Grant, LLC, took title to the hotel in its own name.

Shortly after U.S. Grant, LLC, purchased the hotel, it entered into a hotel management agreement with APMC San Diego Hotel Management, LLC, under which that entity would manage and operate the hotel for a 10-year term, subject to certain rights of termination by either party (the Agreement). In February 2005, U.S. Grant, LLC, notified APMC San Diego Hotel Management, LLC, that it was terminating the Agreement effective immediately due to alleged "mismanagement, misappropriation of funds and breach of fiduciary duty."

In response, APMC[4] asserted (1) it was entitled to retain $1.35 million that had previously been transferred from the hotel's operating account to an unrelated hotel account; (2) U.S. Grant, LLC, owed APMC approximately $400,000 in management, accounting, promotional, marketing and legal fees; and (3) APMC was entitled to $5 million in liquidated damages under the

---

[2] As we have noted, American Property Investors, LLC, created Sycuan Investors, LLC, which in turn created U.S. Grant, LLC. Based on our close reading of documents contained in the record, the purpose for the creation of Sycuan Investors, LLC, was to create an entity that would enter into a mezzanine loan with CRMV, LLC, a Delaware limited liability company. It appears from a description contained in certain loan documents that the mezzanine loan was in an amount up to $9 million and, as a result of the mezzanine loan, CRMV, LLC, obtained a "collateral assignment of the constituent membership interests in [U.S. Grant, LLC]."

[3] The other guarantor of the bank loan was Gallegos. Gallegos is APMC's sole shareholder and the managing member of APMC San Diego Hotel Management, LLC.

[4] We refer generally to APMC here because the record does not permit us to be more specific as to who made the assertions that we describe.

terms of the Agreement because U.S. Grant, LLC, terminated the Agreement without cause and without the notice that was required pursuant to the express terms of the Agreement.

U.S. Grant, LLC, filed suit against APMC, APMC San Diego Hotel Management, LLC, and Gallegos on April 1, 2005, seeking to recover the $1.35 million that had been transferred out of the hotel's operating account and to obtain an injunction to prevent defendants from disposing of the disputed funds. The trial court granted U.S. Grant, LLC's request for injunctive relief with respect to $950,000, pending resolution of U.S. Grant, LLC's claims. Prior to trial, U.S. Grant, LLC, amended its complaint to add, among other claims, causes of action for breach of contract and breach of fiduciary duty.

APMC San Diego Hotel Management, LLC, and Gallegos filed a cross-complaint against U.S. Grant, LLC, seeking $5 million in liquidated damages on the ground that U.S. Grant, LLC, had terminated the Agreement without cause and without notice. U.S. Grant, LLC, answered the cross-complaint on May 13, 2005. U.S. Grant, LLC's answer did not raise tribal sovereign immunity as an affirmative defense.

The case proceeded to trial on the complaint and cross-complaint in January 2006. The jury returned a verdict largely in favor of U.S. Grant, LLC, on its causes of action for breach of contract, breach of fiduciary duty and conversion. The jury denied any relief on the cross-complaint. After posttrial motions, including a successful motion for attorney fees by U.S. Grant, LLC, a notice of appeal was filed by APMC, APMC San Diego Hotel Management, LLC, and Gallegos.

We reversed the judgment in an October 2008 opinion, concluding that the trial court erred "in failing to consider the extrinsic evidence proffered by APMC" concerning how the termination provisions of the Agreement should be interpreted. (*U.S. Grant Hotel Ventures, LLC v. American Property Management Corp.* (Oct. 16, 2008, D048746) [nonpub. opn.].) We explained that if the trial court had not erroneously refused to consider extrinsic evidence, it might have determined that the APMC parties were entitled to notice and an opportunity to cure any defects in performance prior to termination of the Agreement. We remanded the case to the trial court for further proceedings on the complaint and cross-complaint.

In May 2011, U.S. Grant, LLC, filed a motion to dismiss the cross-complaint on the ground of tribal sovereign immunity, contending that it was entitled to Sycuan's sovereign immunity as a subordinate economic entity of the tribe. The trial court issued a written tentative ruling on June 2, 2011, granting the motion to dismiss on the ground that U.S. Grant, LLC, was protected by tribal sovereign immunity. The tentative ruling further rejected the contention that U.S. Grant, LLC, waived its claim of sovereign immunity with respect to the cross-complaint by agreeing to choice of law and arbitration provisions in the Agreement and by filing this lawsuit.

The trial court confirmed its tentative ruling at a hearing on the motion to dismiss and then issued a minute order reflecting its final ruling. The record contains no indication that the trial court or U.S. Grant, LLC, served APMC, APMC San Diego Hotel Management, LLC, or Gallegos with notice of the final ruling.

APMC filed its petition for a writ of mandate in this court on November 9, 2011, which was 159 days after the hearing on the motion to dismiss. We issued an order to show cause on December 22, 2011.

II

DISCUSSION

A. *Standard of Review*

"On a motion asserting sovereign immunity as a basis for dismissing an action for lack of subject matter jurisdiction, the plaintiff bears the burden of proving by a preponderance of evidence that jurisdiction exists. [Citations.] In the absence of conflicting extrinsic evidence relevant to the issue, the question of whether a court has subject matter jurisdiction over an action against an Indian tribe is a question of law subject to our de novo review." (*Campo Band of Mission Indians v. Superior Court* (2006) 137 Cal.App.4th 175, 183 [39 Cal.Rptr.3d 875].)

B. *The Writ Petition Is Timely*

As a preliminary matter, we address U.S. Grant, LLC's contention that we should deny writ relief without reaching the merits of the sovereign immunity issue because the writ petition is untimely.

■ "A petition for extraordinary writ may be considered at any time, however it is properly denied in the discretion of the court when it has not been sought within the time which an appeal could have been sought had the order been appealable." (*Nelson v. Superior Court* (1986) 184 Cal.App.3d 444, 450 [229 Cal.Rptr. 94].)

■ Here, U.S. Grant, LLC, did not establish that the period applicable to an appeal expired before APMC filed its writ petition. Under California Rules of Court, rule 8.104(a)(3), if a party has not been served with the order from which it is appealing, it has 180 days from the date that the order was entered to file an appeal. The record does not reflect that APMC was served—either by the trial court or U.S. Grant, LLC—with notice of the trial court's final ruling on the motion to dismiss. Therefore, the period applicable to an appeal is 180 days. APMC's writ petition was filed 159 days after entry of the minute order dismissing the cross-complaint against U.S. Grant, LLC. Given these circumstances, the petition for writ of mandate was timely, and we will consider it on the merits.

C. *U.S. Grant, LLC, Is Not an Arm of the Sycuan Tribe Protected by Tribal Sovereign Immunity*

■ The doctrine of tribal sovereign immunity is "settled law" developed through years of United States Supreme Court precedent (*Kiowa Tribe of Okla. v. Manufacturing Technologies, Inc.* (1998) 523 U.S. 751, 756 [140 L.Ed.2d 981, 118 S.Ct. 1700] (*Kiowa*)), and is based on the premise that "Indian tribes are 'domestic dependent nations' that exercise inherent sovereign authority over their members and territories." (*Oklahoma Tax Comm'n v. Potawatomi Tribe* (1991) 498 U.S. 505, 509 [112 L.Ed.2d 1112, 111 S.Ct. 905].) "Indian tribes have long been recognized as possessing the common-law immunity from suit traditionally enjoyed by sovereign powers. [Citations.] This aspect of tribal sovereignty, like all others, is subject to the superior and plenary control of Congress. But 'without congressional authorization,' the 'Indian Nations are exempt from suit.' " (*Santa Clara Pueblo v. Martinez* (1978) 436 U.S. 49, 58 [56 L.Ed.2d 106, 98 S.Ct. 1670].) "[A]n Indian tribe is not subject to suit in a state court—even for breach of contract involving off-reservation commercial conduct—unless 'Congress has authorized the suit or the tribe has waived its immunity.' " (*C & L Enterprises, Inc. v. Citizen Band Potawatomi Tribe of Okla,* (2001) 532 U.S. 411, 414 [149 L.Ed.2d 623, 121 S.Ct. 1589].)

■ Although it is settled that an Indian tribe is entitled to sovereign immunity from suit—even for off-reservation commercial activity (*Kiowa, supra,* 523 U.S. at p. 760)[5]—the United States Supreme Court has not squarely addressed the circumstances, if any, in which a *separate entity* related to an Indian tribe is protected by that tribe's sovereign immunity.[6] In the absence of United States Supreme Court authority, the federal and state courts have been left to decide for themselves whether a separate entity related to an Indian tribe shares in the tribe's sovereign immunity.

■ "It is clear from the cases involving tribal entities that such entities have no inherent immunity of their own. Instead, they enjoy immunity only to the extent the immunity of the tribe, which does have inherent immunity, is extended to them." (*Trudgeon v. Fantasy Springs Casino* (1999) 71 Cal.App.4th 632, 639 [84 Cal.Rptr.2d 65] (*Trudgeon*).) "[M]ost courts have rejected, implicitly if not explicitly, the suggestion that courts should 'confer tribal immunity on every entity established by an Indian tribe, no matter what its purposes or activities might have been.' [Citation.] These decisions hold that whether tribal immunity should be extended to a tribal business entity should depend on the degree to which the tribe and entity are related in terms of such factors as purpose and organizational structure. Applying that standard, courts have reached various conclusions on the immunity issue, depending on the facts." (*Trudgeon,* at p. 638.) The analytical inquiry is often summarized as whether the tribally related entity is "an arm of the tribe" for sovereign immunity purposes (*Allen v. Gold Country Casino* (9th Cir. 2006) 464 F.3d 1044, 1046 (*Allen*); *Inyo County, supra,* 538 U.S. at p. 705, fn. 1; *Cash Advance & Preferred Cash Loans v. Colorado ex rel. Suthers* (Colo. 2010) 242 P.3d 1099, 1109 (*Cash Advance*)), and we will use that terminology. (But see *Breakthrough Management Group, Inc. v. Chukchansi Gold Casino & Resort* (10th Cir. 2010) 629 F.3d 1173, 1185, fn. 9 (*Breakthrough*) [explaining differing terminology used by courts, but using the term " 'subordinate economic entity' " of the tribe].)

---

[5] The United States Supreme Court's decision in *Kiowa* "teaches that the nature and the location of the activity of the Indian tribe at issue in a suit is not relevant to determining whether a tribe is immune from suit, but it did not address whether the tribal entity [(also mentioned in *Kiowa*)] enjoyed the same immunity." (*Bittle v. Bahe* (2008) 2008 OK 10 [192 P.3d 810, 826, fn. 19].)

[6] In *Inyo County v. Paiute-Shoshone Indians of Bishop Community of Bishop Colony* (2003) 538 U.S. 701 [155 L.Ed.2d 933, 123 S.Ct. 1887] (*Inyo County*), the United States Supreme Court touched on the issue of whether an entity related to a tribe is entitled to sovereign immunity, but did not otherwise explore the issue. In that case, an Indian tribe and a gaming corporation "chartered and wholly owned" by the tribe filed a federal civil rights lawsuit claiming that principles of tribal sovereignty had been violated when local law enforcement executed a search warrant covering tribal casino payroll records. (*Id.* at p. 704.) As the Supreme Court explained in a footnote, "The United States [(as amicus curiae)] maintains, and [the petitioner county] does not dispute, that the [tribally chartered gaming corporation] is an 'arm' of the Tribe for sovereign immunity purposes." (*Id.* at p. 705, fn. 1.)

 Opinions from the federal and state courts have identified a range of factors that are helpful in analyzing whether an entity related to an Indian tribe should be considered an arm of the tribe for sovereign immunity purposes. The United States Court of Appeals for the Tenth Circuit recently surveyed some of the applicable opinions, concluding that a court "should look to a variety of factors when examining the relationship between the economic entities and the tribe, including but not limited to: (1) their method of creation; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) whether the tribe intended for the entities to have tribal sovereign immunity; (5) the financial relationship between the tribe and the entities; and (6) whether the purposes of tribal sovereign immunity are served by granting immunity to the entities." (*Breakthrough, supra,* 629 F.3d at p. 1181; see *id.* at pp. 1187–1188.) We agree that the list of factors set forth by the Tenth Circuit is helpful and, although the factors overlap somewhat when applied, they accurately reflect the general focus of the applicable federal and state case law. Here, when we apply those factors we conclude that U.S. Grant, LLC, is not an arm of the Sycuan tribe entitled to sovereign immunity. As we will explain, the dispositive fact throughout our analysis is that U.S. Grant, LLC, is a California limited liability company.

The first factor in the Tenth Circuit's list is "the method of creation of the economic entit[y]." (*Breakthrough, supra,* 629 F.3d at p. 1187.) As the Colorado Supreme Court recently explained after reviewing applicable federal authorities, the relevant consideration with respect to this factor is "whether the tribes created the entities pursuant to tribal law." (*Cash Advance, supra,* 242 P.3d at p. 1110.) "Essentially, tribal sovereign immunity protects tribal governmental corporations owned and controlled by a tribe and *created under its own tribal laws.*" (*Wright v. Colville Tribal Enterprise Corp.* (2006) 159 Wn.2d 108 [147 P.3d 1275, 1279], italics added (*Colville*).) Thus, for example, the Tenth Circuit in *Breakthrough* stated that because the tribally associated entities were created under tribal law pursuant to the tribe's constitution, the method of their creation "weigh[ed] in favor of the conclusion that these entities are entitled to tribal sovereign immunity." (*Breakthrough,* at p. 1191.) Similarly, other courts have considered creation of an entity under tribal law as a factor weighing significantly in favor of a conclusion that the entity shares in the tribe's sovereign immunity. (*Trudgeon, supra,* 71 Cal.App.4th at pp. 640, 641 [discussing significance of the fact that the tribal casino at issue was organized under tribal law rather than state law]; *Gavle v. Little Six, Inc.* (Minn. 1996) 555 N.W.2d 284, 295 [concluding that a tribal casino was protected by sovereign immunity based in part on the fact that it was incorporated under tribal law, rather than under the "corporate laws of Minnesota"]; *Cook v. AVI Casino Enterprises, Inc.* (9th Cir. 2008)

548 F.3d 718, 726 [sovereign immunity applied to tribal casino corporation based, in part, on the fact that it was created under tribal law].)[7]

■ In contrast, creation of a separate legal entity pursuant to *state law*, rather than tribal law, weighs heavily against a finding that an entity related to an Indian tribe is an arm of the tribe protected by sovereign immunity. (See, e.g., *Runyon v. Assn. of Village Council Presidents* (Alaska 2004) 84 P.3d 437, 441 (*Runyon*) [nonprofit corporation formed under Alaska law by a group of Indian tribes was not protected by sovereign immunity because of the "legal insulation" created by state incorporation]; *Airvator, Inc. v. Turtle Mountain Manufacturing Co.* (N.D. 1983) 329 N.W.2d 596, 604 (*Airvator*) [majority Indian-owned N.D. corporation was not entitled to sovereign immunity because of its incorporation under state law]; *Wright v. Prairie Chicken* (1998) 1998 SD 46 [579 N.W.2d 7, 10] [incorporation under state law by tribal social service organization would weigh against claim of sovereign immunity by corporate directors].) Indeed, one law review article advocates that tribes should form corporations under state law to unambiguously communicate to potential business partners their desire to forego sovereign immunity with respect to a specific enterprise. (Bernardi-Boyle, *State Corporations for Indian Reservations* (2001) 26 Am. Indian L.Rev. 41, 58 (hereafter Bernardi-Boyle).) Similarly, the Washington Supreme Court has pointed out that a tribe may effectively communicate an intention to waive sovereign immunity for a tribal enterprise by creating a business entity under state law. (*Colville, supra,* 147 P.3d at p. 1280 ["a tribe may waive the immunity of a tribal enterprise by incorporating the enterprise under state law, rather than tribal law"].)[8]

---

[7] In addition to incorporating a business entity under tribal law, an Indian tribe may also obtain a charter of incorporation under federal law pursuant to section 17 of the Indian Reorganization Act, creating an "incorporated tribe" with the power to issue interests in corporate property. (25 U.S.C. § 477.) Case law generally concludes that, absent waiver, such entities are entitled to tribal sovereign immunity. (*Amerind Risk Management Corp. v. Malaterre* (8th Cir. 2011) 633 F.3d 680, 685 [citing cases].)

[8] In its briefing in the trial court and in its informal response to the writ petition, U.S. Grant, LLC, cites authority for the proposition that "mere organization of an entity under state law does not preclude its characterization as a tribal organization." However, in none of those cases is sovereign immunity at issue. Instead, those cases discuss whether a tribally created entity is an "Indian tribe" within the meaning of the tribal exemption contained in title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.) (*Duke v. Absentee Shawnee Tribe of Oklahoma Housing Authority* (10th Cir. 1999) 199 F.3d 1123), or is an "Indian tribal organization" for the purposes of a federal law making it a crime to steal from such an organization (*U.S. v. Logan* (10th Cir. 1981) 641 F.2d 860; *U.S. v. Crossland* (10th Cir. 1981) 642 F.2d 1113). Because of the different policy questions and statutory language involved, "[w]hether an entity is a tribal entity depends on the context in which the question is addressed." (*Smith v. Salish Kootenai College* (9th Cir. 2006) 434 F.3d 1127, 1133; see *Dille v. Council of Energy Resource Tribes* (10th Cir. 1986) 801 F.2d 373, 376 ["the definition of an Indian tribe changes depending upon the purpose of the regulation or statutory provision under consideration"].) Indeed, all of the cases that U.S. Grant, LLC, cites are from the Tenth Circuit, which, as we have explained, is the same court that set forth the various factors for considering whether tribal *sovereign*

The North Dakota Supreme Court's long-standing opinion in *Airvator,* *supra,* 329 N.W.2d 596, contains a detailed explanation of why a tribe's creation of an entity under state law weighs against a finding that the entity is protected by the tribe's sovereign immunity. As *Airvator* points out, a corporation formed under state law is an entity that is legally separate from its shareholders. (*Id.* at p. 603.) Such an entity exists by virtue of the sovereign power of the state that created it, and its powers are defined and limited by state laws, including—in the case of North Dakota corporations—a provision specifying that a corporation has the power to sue and be sued. (*Ibid.*) In light of these facts, *Airvator* concluded that a corporation chartered under state law should be subject to the jurisdiction of the state where it is incorporated. (*Ibid.*)

█ The same analysis applies to U.S. Grant, LLC, as a California limited liability company. U.S. Grant, LLC, was created pursuant to California's Beverly-Killea Limited Liability Company Act (Corp. Code, § 17000 et seq.). "A limited liability company is a hybrid business entity formed under the Corporations Code and consisting of one or more members (Corp.C. 17001(t), (x)), who own membership interests (Corp.C. 17001(z))." (9 Witkin, Summary of Cal. Law (2011 supp.) Corporations, § 36, p. 150.) "The company has a legal existence separate from its members. Its form provides members with limited liability to the same extent enjoyed by corporate shareholders (Corp.C. 17101), but permits the members to actively participate in the management and control of the company (Corp.C. 17150)." (9 Witkin, Summary of Cal. Law (10th ed. 2005) Corporations, § 36, p. 813.) According to statute, among the powers of a California limited liability company is to "[s]ue, be sued, complain and defend any action . . . in its own name." (Corp. Code, § 17003, subd. (b).) Further, a California limited liability company is required to maintain an "agent in this state for service of process on the limited liability company" (*id.,* § 17057, subd. (b)); is statutorily subject to orders by California courts to produce books and records (*id.,* § 17061, subd. (e)); and, according to statute, may be sued by the California Attorney General in an action to enforce the rights of the company's members (*id.,* § 17107). In light of these considerations, U.S. Grant, LLC's status as a California limited liability company weighs heavily in favor of finding it subject to the jurisdiction of California courts, regardless of its relationship to the Sycuan tribe.

█ Turning to the second factor identified by the Tenth Circuit, we examine the purpose served by U.S. Grant, LLC. (*Breakthrough, supra,* 629 F.3d at p. 1181.) As *Trudgeon* noted, "it is possible to imagine situations in which a tribal entity may engage in activities which are so far removed

---

*immunity* applies to an entity associated with an Indian tribe, and one of those factors is "the method of creation of the economic entit[y]." (*Breakthrough, supra,* 629 F.3d at p. 1187.)

from tribal interests that it no longer can legitimately be seen as an extension of the tribe itself. Such an entity arguably should not be immune, notwithstanding the fact it is organized and owned by the tribe." (*Trudgeon, supra,* 71 Cal.App.4th at p. 639.) According to its operating agreement, the purpose for the formation of U.S. Grant, LLC, was to acquire title to the hotel and operate it. Thus, U.S. Grant, LLC, exists purely for the purpose of participating in an ordinary for-profit business enterprise. In contrast stand cases in which a tribe created an entity to provide housing or social services to tribal members (see, e.g., *Ransom v. St. Regis Mohawk Education & Community Fund, Inc.* (N.Y. 1995) 86 N.Y.2d 553 [635 N.Y.S.2d 116, 658 N.E.2d 989, 993] (*Ransom*) [nonprofit entity organized by Indian tribe to provide educational, health care and social services to residents of tribe's reservation was protected by tribal sovereign immunity because those were functions "traditionally shouldered by tribal government"]; *Weeks Construction, Inc. v. Oglala Sioux Housing Authority* (8th Cir. 1986) 797 F.2d 668, 671 [housing authority created by tribe to develop housing projects on reservation was entitled to sovereign immunity as an arm of the tribal government]). This case is also not similar to those involving tribal casinos, such as *Trudgeon, supra,* 71 Cal.App.4th 632, in which a tribe expressly created a tribally chartered entity to operate a casino " 'in its quest for self-determination.' " (*Id.* at p. 640, italics omitted.) A tribe's operation of a casino presents a unique situation because the federal Indian Gaming Regulatory Act (the IGRA) (25 U.S.C. § 2710(b)(2)(B)) provides that gaming revenue is required to be used for the benefit of the tribe;[9] "[t]he IGRA provides for the creation and operation of Indian casinos to promote 'tribal economic development, self-sufficiency, and strong tribal governments[,]' [(25 U.S.C. § 2702(1))]"; and "[o]ne of the principal purposes of the IGRA is 'to insure that the Indian tribe is the primary beneficiary of the gaming operation.' [(*Id.,* § 2702(2))]." (*Allen, supra,* 464 F.3d at p. 1046 [explaining that the casino at issue was "not a mere revenue-producing tribal business"].) We perceive nothing comparable in the purpose of creating U.S. Grant, LLC, to tip the balance in favor of a finding that it is protected by tribal sovereign immunity. (See *Dixon v. Picopa Construction Co.* (1989) 160 Ariz. 251 [772 P.2d 1104, 1110] (*Dixon*) [purpose of tribal corporation did not weigh in favor of finding sovereign immunity when the corporation "was not formed to aid the [tribe] in carrying out tribal governmental functions" and appeared to be "simply a for-profit corporation involved in construction projects"].)

---

[9] Specifically, *Trudgeon* pointed out that the IGRA provides that revenue from Indian gaming is required to be used only " '(i) to fund tribal government operations or programs; [¶] (ii) to provide for the general welfare of the Indian tribe and its members; [¶] (iii) to promote tribal economic development; [¶] (iv) to donate to charitable organizations; or [¶] (v) to help fund operations of local government agencies.' " (*Trudgeon, supra,* 71 Cal.App.4th at p. 640, quoting 25 U.S.C. § 2710(b)(2)(B).)

When we consider the "structure, ownership, and management" of the entity (*Breakthrough, supra*, 629 F.3d at p. 1181), we observe that the ownership of U.S. Grant, LLC, is not closely tied to the Sycuan tribe. As we have explained, U.S. Grant, LLC, is owned by another California limited liability company and is separated by yet another layer of limited liability company ownership from the indirect ownership and control of the tribal corporation STDC.[10] The *indirect* nature of STDC's ownership weakens U.S. Grant, LLC's relationship with the Sycuan tribe for the purpose of a sovereign immunity analysis. With respect to management, U.S. Grant, LLC's operating agreement states that it is to be managed by a nontribal entity—APMC San Diego Hotel Management, LLC. In contrast, the operating agreement for the first of the California limited liability companies created for the hotel purchase transaction (i.e., American Property Investors, LLC) states that the tribal corporation STDC is the manager. The designation of a nontribal entity instead of STDC to manage U.S. Grant, LLC, is an indication that U.S. Grant, LLC, is *not* an arm of the Sycuan tribe protected by sovereign immunity. (See *Dixon, supra*, 772 P.2d at p. 1109 [tribally chartered corporation was not protected by sovereign immunity, in part, because "the tribal government does not manage the corporation"].) In light of these facts, the structure, ownership, and management of U.S. Grant, LLC, does not weigh in favor of finding that entity to be an arm of the tribe for the purpose of sovereign immunity.

We also perceive no evidence in the record that "the tribe intended for [U.S. Grant, LLC] to have tribal sovereign immunity . . . ." (*Breakthrough, supra*, 629 F.3d at p. 1181.) On the contrary, we infer that STDC was not primarily concerned about sovereign immunity with respect to the entities that it created to facilitate its investment in the hotel, as it clearly understood—due to its own corporate origins—that it could create a business entity under Sycuan's tribal laws rather than under California law, but it chose not to do so. Further, we interpret U.S. Grant, LLC's six-year delay in asserting sovereign immunity as further circumstantial evidence that Sycuan did not view U.S. Grant, LLC, as an arm of the tribe protected by sovereign immunity.[11]

---

[10] As the issue is not before us, we express no view on whether STDC, as a tribal corporation formed under Sycuan's laws, is protected by Sycuan's tribal sovereign immunity.

[11] U.S. Grant, LLC, submitted evidence that the bank loan agreement with the lender for the purchase of the hotel and the license agreement with The Sheraton Corporation for the branding of the hotel contained provisions waiving, for the purposes of those transactions, any sovereign immunity that U.S. Grant, LLC, might possess. Neither of those documents are persuasive evidence that Sycuan or STDC intended U.S. Grant, LLC, to be protected by tribal sovereign immunity and therefore asserted sovereign immunity as an issue during contractual negotiations. Significantly, (1) the waiver in the license agreement was suggested by Sheraton, not by U.S. Grant, LLC, and (2) with respect to the loan documents, the waiver applies

■ With respect to "the financial relationship between the tribe and the entities" (*Breakthrough, supra*, 629 F.3d at p. 1181), relevant considerations include "whether the corporate entity generates its own revenue, whether a suit against the corporation will impact the tribe's fiscal resources, and whether the subentity has the 'power to bind or obligate the funds of the [tribe]' [citation]. The vulnerability of the tribe's coffers in defending a suit against the subentity indicates that the real party in interest is the tribe." (*Ransom, supra*, 658 N.E.2d at pp. 992–993.) In this regard, the limited liability created when U.S. Grant, LLC, organized as a California limited liability company strongly indicates that U.S. Grant, LLC, is not an arm of the tribe for sovereign immunity purposes. ■ A member of a California limited liability company—like a corporate shareholder—is not personally liable for the debts, legal liability or obligations of the company unless liability attaches under an alter ego theory. (Corp. Code, § 17101.) U.S. Grant, LLC's operating agreement incorporates this principle, stating that "[t]he Member will not be liable to any creditor of the Company for Company liabilities or losses or for any amount in excess of the amount the Member originally agreed to contribute to the Company plus any contribution returned and recoverable under [the Beverly-Killea Limited Liability Company Act]." Thus, due to U.S. Grant, LLC's status as a California limited liability company, the Sycuan tribe's assets would not be exposed by any judgment against U.S. Grant, LLC. Further, even though the tribal corporation STDC indirectly owns U.S. Grant, LLC, it too is not exposed to liability for any judgment against U.S. Grant, LLC. STDC's financial risk is limited to the capital it contributed to U.S. Grant, LLC.[12] As with any person or entity making an investment in a limited liability company or a corporation, STDC's risk is completely cut off at the level of its voluntary investment in the entity. As the Alaska Supreme Court explained in *Runyon* when deciding that an entity incorporated by several tribes under state law was not protected by sovereign immunity, "[t]he tribes' use of the corporate form protects their assets from being called upon to answer the corporation's debt. But this protection means that they are not the real party in interest. . . . By severing their treasuries from the corporation, they have also cut off their sovereign immunity before it reaches [the corporation]." (*Runyon, supra*, 84 P.3d at p. 441.) The same is true here. The limited liability that arises from U.S. Grant, LLC's status as a California limited liability company weighs heavily against a finding that it is an arm of the tribe protected by sovereign immunity.

expressly to the tribal corporation STDC, which acted as one of the guarantors of the loan and signed the loan documents in that capacity.

[12] The record is not clear as to the total amount of STDC's financial investment in U.S. Grant, LLC. As we have explained, the initial capital investment was $18 million, and the record indicates that U.S. Grant, LLC's manager made subsequent requests for capital contributions pursuant to the procedure set forth in U.S. Grant, LLC's operating agreement.

Further, we recognize that STDC—as the indirect owner of U.S. Grant, LLC—will reap the benefits of any favorable financial performance and will suffer a loss in the value of its investment if U.S. Grant, LLC, performs poorly. However, this fact is not dispositive of whether U.S. Grant, LLC, is an arm of the Sycuan tribe protected by sovereign immunity. "We reject this concept" because "[i]ts inevitable consequence would be to confer tribal immunity on every entity established by an Indian tribe . . . ." (*Dixon, supra,* 772 P.2d at p. 1108, fn. 7 [rejecting significance of the fact that the tribe would "reap the benefits" from a tribal construction company's financial performance, and concluding that the construction corporation, in which the tribe was the sole stockholder, was not an arm of the tribe protected by sovereign immunity].)

Our final consideration is "whether the purposes of tribal sovereign immunity are served by granting immunity to the entities." (*Breakthrough, supra,* 629 F.3d at p. 1181.) The discussion in the case law of this factor overlaps significantly with other factors we have already discussed. As the Tenth Circuit noted in discussing whether the purposes of sovereign immunity were served in *Breakthrough,* " '[c]ases which have not extended immunity to tribal enterprises typically have involved enterprises formed "solely for business purposes and without any declared objective of promoting the [tribe's] general tribal or economic development." ' " (*Id.* at p. 1195.) Here, as we have explained, the declared business purpose for forming U.S. Grant, LLC, was to acquire and operate the hotel as a profitable enterprise rather than for any specific purpose related to tribal development. Further, in determining whether the policy behind tribal sovereign immunity is furthered by conferring immunity on an entity related to an Indian tribe, cases look to whether immunity "directly protects the sovereign Tribe's treasury, which is one of the historic purposes of sovereign immunity in general." (*Allen, supra,* 464 F.3d at p. 1047; see *Breakthrough,* at p. 1195 [quoting *Allen*].) As we have already discussed, sovereign immunity is not necessary to protect the tribe's treasury because of the limited liability created by organizing U.S. Grant, LLC, as a California limited liability company.

To the extent—as suggested by the Arizona Supreme Court—that the policies underlying sovereign immunity include "preservation of tribal cultural autonomy, preservation of tribal self-determination, and promotion of commercial dealings between Indians and non-Indians" (*Dixon, supra,* 772 P.2d at p. 1111), those policies are not diminished by concluding that U.S. Grant, LLC—as an entity organized under California law—is subject to suit. Indeed, an Indian tribe's ability to create a legally distinct nonimmune entity under state law promotes commercial dealings between Indians and non-Indians by allowing tribes to participate in commercial

transactions without the added complexity and expense that sovereign immunity concerns bring to a transaction.[13]

In sum, considering all of the factors that courts have found helpful in determining whether an entity related to an Indian tribe is an arm of the tribe for the purpose of sovereign immunity, we conclude that the balance of factors weighs heavily *against* sovereign immunity for U.S. Grant, LLC. As we have explained, the most significant fact is U.S. Grant, LLC's organization as a California limited liability company. We therefore conclude that the trial court erred in dismissing the cross-complaint on the basis of tribal sovereign immunity.[14]

## DISPOSITION

Let a writ of mandate issue commanding the superior court to vacate its June 3, 2011 order granting U.S. Grant, LLC's motion to dismiss. Petitioner is entitled to recover the costs it incurred in this writ proceeding. (Cal. Rules of Court, rule 8.493(a)(2).)

Huffman, Acting P. J., concurred.

**AARON, J.,** Concurring.—I concur in the majority's conclusion that U.S. Grant Hotel Ventures, LLC (U.S. Grant, LLC), is not a subordinate economic entity of the Sycuan Band of the Kumeyaay Nation. However, I do not believe that the resolution of this question in this case is nearly as clear cut as the majority opinion suggests.

The majority states at the outset of its analysis that the fact that U.S. Grant, LLC, is a California limited liability company is "dispositive" in determining whether U.S. Grant is an "arm of the Sycuan tribe entitled to

---

[13] As has been acknowledged, "[n]on-Indians will undoubtedly think long and hard before entering into business relationships with Indian corporations that are immune from suit. [Citation.] This may well retard a tribe's economic growth." (*Dixon, supra,* 772 P.2d at p. 1112; see Bernardi-Boyle, *supra,* 26 Am. Indian L.Rev. at pp. 46, 42 [noting that "[a] potential business partner of a tribe cannot easily predict whether . . . tribal immunity will ultimately allow the tribe to escape the terms of its contracts" and advocating that "tribes can overcome the stigma of instability and attract capital by conducting business through corporations formed under state law"].)

[14] We note that due to U.S. Grant, LLC's choice to defend the cross-complaint on the merits for six years—through trial and appeal—without raising sovereign immunity as a defense, serious issues arise as to whether that litigation conduct communicated a waiver of whatever sovereign immunity might have existed. However, because we have concluded that U.S. Grant, LLC, is not protected by sovereign immunity, we need not, and do not, reach the issue of whether U.S. Grant, LLC's litigation conduct served as an express waiver of any sovereign immunity it might have possessed.

sovereign immunity." (Maj. opn., *ante*, at p. 501.) While the majority proceeds to address the factors set forth in *Breakthrough Management Group, Inc. v. Chukchansi Gold Casino & Resort* (10th Cir. 2010) 629 F.3d 1173 (*Breakthrough*) for analyzing whether an entity that is related to an Indian tribe should be considered to be an arm of the tribe for purposes of sovereign immunity, its discussion of these factors appears to be colored by its previously stated conclusion that incorporation under state law is "dispositive."

As to the first *Breakthrough* factor, " 'the method of creation of the economic entit[y],' " I would agree that the fact that U.S. Grant, LLC, was created under California law as a limited liability company *weighs against* a finding that it is entitled to tribal sovereign immunity. (Maj. opn., *ante*, at p. 501.) However, I do not believe that this fact is or should be considered to be dispositive on the question. Rather, as *Breakthrough* indicates, it is one of several factors to be taken into consideration in the analysis.

In analyzing the second *Breakthrough* factor, the purpose served by the entity, the majority looks solely to the operating agreement of U.S. Grant, LLC, and notes that the agreement indicates that the purpose of the company was to acquire the U.S. Grant Hotel and operate it. Based on this limited review of the record, the majority concludes, "Thus, U.S. Grant, LLC, exists purely for the purpose of participating in an ordinary for-profit business enterprise." (Maj. opn., *ante*, at p. 504.) In making this assertion, the majority overlooks the historical ties between the tribe and the hotel, which served as a motivating factor for the tribe's purchase of the hotel.

Daniel Tucker, chairman of the board of Sycuan Tribal Development Corporation (STDC) and chairman of the Sycuan Band of the Kumeyaay Nation, testified that purchasing the hotel "was a great historical thing for the tribe" because the tribe "got property in downtown San Diego that they took from us . . . ." He further explained that one of the reasons the tribe thought it would be significant to acquire the U.S. Grant Hotel, in particular, is because it was President Ulysses S. Grant who signed the order to place the Sycuan tribe on its reservation in 1875. Tucker stated that the tribe "looked at it as a historical moment for us all. And that was the tribe's interest in it. Sure, to make a profit of it. But still the historical part of it even was greater than that." Before the tribe was able to complete the deal to purchase the hotel, tribe members decided to create a museum of tribal artifacts in the hotel. The hotel displays genuine Indian artifacts and art and serves as a museum of tribal history. Thus, the record suggests that the tribe was motivated to purchase the hotel by both a desire to preserve and commemorate the tribe's history as well as profit making. For this reason, I cannot agree with the majority's assertion that U.S. Grant, LLC, exists "purely for the purpose of participating in an ordinary for-profit business." (Maj. opn., *ante*, at p. 504.)

However, in view of the fact that investment in a hotel is inherently a for-profit enterprise, I would conclude that on balance, this factor weighs against a determination that U.S. Grant, LLC, is an arm of the tribe entitled to tribal sovereign immunity.

The next *Breakthrough* factor is the structure, ownership, and management of the entity, including the amount of control that the tribe has over it. The majority concludes that "the ownership of U.S. Grant, LLC, is not closely tied to the Sycuan tribe," and thus, that this factor "does not weigh in favor of finding [U.S. Grant, LLC] to be an arm of the tribe for the purpose of sovereign immunity." (Maj. opn., *ante*, at p. 505.) I disagree. STDC, which is wholly owned by the tribe and was formed under Sycuan's tribal laws, wholly owns American Property Investors, a limited liability company formed under California law. American Property Investors wholly owns Sycuan Investors, another limited liability company formed under state law, which in turn wholly owns U.S. Grant, LLC. Thus, the entity and the tribe are separated by an unbroken chain of wholly owned entities. Although there are several legal entities in the chain separating the tribe and U.S. Grant, LLC, the structure and ownership of these entities are all directly related to the tribe. Further, the operating agreements between these entities are all signed by the same three STDC board members: Daniel Tucker, chairman of the STDC board; John Tang, president of STDC; and Tina Muse, secretary of STDC. It is thus clear that all of these entities shared ownership and management.

With respect to the management of U.S. Grant, LLC, American Property Management Corporation (APMC) was hired as a management company to run the hotel. However, STDC board members were active in the extensive renovation of the hotel upon its purchase, and were in regular contact with APMC management regarding all aspects of the hotel's management, including the operational funding needs of the hotel and vendor complaints. Further, STDC and the tribe retained ultimate control over the hotel's management, as is reflected by the fact that Daniel Tucker, chairman of the board of STDC and tribal chairman of the Sycuan Band of the Kumeyaay Nation, terminated APMC's management contract, and signed the termination letter on behalf of *all* of the wholly owned entities (i.e., U.S. Grant, LLC, Sycuan Investors, American Property Investors, and STDC). The record discloses that even APMC believed that the owner of the hotel was the Sycuan tribe, and that as the owner, the tribe had final authority over the renovation and fiscal management of the hotel. In view of these facts, I conclude that this factor weighs in favor of extending the tribe's sovereign immunity to U.S. Grant, LLC.

As to the fourth *Breakthrough* factor, the *Breakthrough* court concluded that evidence in that case that the tribe intended that the entity at issue share

in its sovereign immunity supported a finding of immunity for the entity. The absence of such evidence in this case supports a contrary conclusion here. In its analysis of this factor, the majority infers that STDC was "not primarily concerned about sovereign immunity with respect to the entities that it created to facilitate its investment in the hotel," citing the fact that STDC chose to create U.S. Grant, LLC, under California law rather than under tribal law, and on this basis concludes that this factor weighs against according tribal sovereign immunity to U.S. Grant, LLC. (Maj. opn., *ante*, at p. 505.) In my view, while the creation of U.S. Grant, LLC, under state law might be relevant in determining the tribe's intent to share its sovereign immunity, this factor has already been effectively considered and weighed in considering the first *Breakthrough* factor, i.e., the " 'method of creation of the economic entit[y].' " (Maj. opn., *ante*, at p. 501.) Thus, while I agree that this factor, i.e., whether the tribe intended that the entity at issue share in its sovereign immunity, weighs in favor of concluding that U.S. Grant, LLC, is not a subordinate entity of the tribe, I reach this conclusion because there is no evidence in the record that the tribe intended to share its immunity with U.S. Grant, LLC.

The next *Breakthrough* factor is the financial relationship between the tribe and the entity. Citing the formation of U.S. Grant, LLC, as a limited liability company, the majority asserts that STDC's financial risk with respect to U.S. Grant, LLC, is thus limited to the capital that STDC contributed to U.S. Grant, LLC, and, based on that assertion, states, "As with any person or entity making an investment in a limited liability company or a corporation, STDC's risk is completely cut off at the level of its voluntary investment in the entity." (Maj. opn., *ante*, at p. 506.) The majority also asserts, "[D]ue to U.S. Grant, LLC's status as a California limited liability company, the Sycuan tribe's assets would not be exposed by any judgment against U.S. Grant, LLC." (*Ibid.*)

This analysis is similar to the analysis that the Tenth Circuit rejected in *Breakthrough*. The *Breakthrough* court noted that the district court in that case had found "dispositive" the fact that "a judgment against the [entities claiming tribal sovereign immunity] would not endanger the Tribe's right to receive profits." (*Breakthrough, supra*, 629 F.3d at p. 1186.) The *Breakthrough* court concluded that the "district court applied the wrong legal standard . . ." (*ibid.*), and that prior circuit precedent had not even considered "whether a judgment against [the entity claiming tribal sovereign immunity] would reach the tribe's monetary assets, much less designate that factor as a threshold determination." (*Id.* at p. 1187.)

The majority "recognize[s] that STDC—as the indirect owner of U.S. Grant, LLC—will reap the benefits of any favorable financial performance

and will suffer a loss in the value of its investment if U.S. Grant, LLC, performs poorly," and goes on to state that this fact is "not dispositive" of the question whether U.S. Grant, LLC, is an arm of the tribe entitled to sovereign immunity. (Maj. opn., *ante*, at p. 507.) This fact may not be dispositive of the sovereign immunity issue, but the full extent and nature of the financial ties between the entities is clearly a factor to be weighed in the analysis. The majority's analysis of the financial relationship between the tribe and U.S. Grant, LLC, is, in my view, incomplete and as a result, understates the tribe's investment and its involvement in the financial affairs of the entity. STDC funded $18 million of the purchase price of the hotel, representing the amount not financed by loans. The tribal controller testified that the source of the $18 million was from revenue that the tribe had taken in from its casino and resort. In addition, the tribe regularly met the financial obligations of the hotel with funds from the tribe's accounts. Given these undisputed facts, the financial relationship between the tribe and the hotel cannot fairly be analogized as that of "any person or entity making an investment in a limited liability company or a corporation." (Maj. opn., *ante*, at p. 506.)

In my view, the financial ties between the tribe and U.S. Grant, LLC, which go far beyond those of any investor in a limited liability company or corporation, weigh in favor of according tribal sovereign immunity to U.S. Grant, LLC.

The final *Breakthrough* factor is a consideration of the policies underlying tribal sovereign immunity and its connection to tribal economic development, and whether those policies are served by granting immunity to the economic entity. In applying this factor, the *Breakthrough* court observed, "The Authority and the Casino plainly promote and fund the Tribe's self-determination through revenue generation and the funding of diversified economic development. [Citations.] Not only has 'Congress . . . expressed a strong policy in favor of encouraging tribal economic development,' Note, *Tribal Sovereign Immunity: Searching for Sensible Limits* [(1988) 88 Colum. L.Rev. 173,] 186, but extending immunity to the Authority and the Casino 'directly protects the sovereign Tribe's treasury, which is one of the historic purposes of sovereign immunity in general' [citation]. In comparison, '[c]ases which have not extended immunity to tribal enterprises typically have involved enterprises formed "solely for business purposes and without any declared objective of promoting the [tribe's] general tribal or economic development." ' [Citation.]" (*Breakthrough, supra*, 629 F.3d at p. 1195.)

Noting that Congress has promoted tribal sovereignty through economic development by authorizing Indian gaming, that the Chukchansi tribe "depend[ed] heavily on the Casino for revenue to fund its governmental functions, its support of tribal members, and its search for other economic

development opportunities," and that 100 percent of the casino's revenues went to the entities involved, the *Breakthrough* court determined that the entities at issue in that case, a tribal casino and its governing authority, should share in the tribe's sovereign immunity. (*Breakthrough, supra,* 629 F.3d at p. 1195.)

The record in this case contains a number of statements by John Tang, STDC president, and Mark Woelfel, the tribe's controller, to the effect that the Sycuan tribe purchased the hotel because it wanted to diversify its economic development. According to Tang, the tribe's purpose in forming STDC was to establish an entity that would be able to generate revenue for the tribe, and specifically, "create a diversified portfolio so the tribe isn't relying on gaming forever and ever." Tang said that he and the tribe were introduced to the idea of purchasing the hotel after discussing "Sycuan's . . . wish to—to be—to be economic[ally] diversified, to make investments off the reservation, and that we were actively looking for investments." Woelfel explained that before the purchase of the hotel, the tribe's only sources of revenue were the casino and the resort.

Thus, like the operation of the casino in *Breakthrough*, the Sycuan tribe's purchase of the hotel in the present case was intended to further the tribe's "self-determination through revenue generation and the funding of diversified economic development." (*Breakthrough, supra,* 629 F.3d at p. 1195.) However, the relationship between the tribe and the hotel is not as symbiotic as that of the tribe and the casino in *Breakthrough*, and it is difficult to ascertain to what extent the hotel "plainly promote[s] and fund[s] the Tribe's self-determination through revenue generation and the funding of diversified economic development" (*ibid.*), as opposed to being an enterprise " 'formed "solely for business purposes and without any declared objective of promoting the [tribe's] general tribal or economic development." ' [Citation.]" (*Ibid.*) While the question is, in my view, a close one, I would ultimately conclude that this factor weighs neither in favor of, nor against, a determination that U.S. Grant, LLC, is an arm of the Sycuan tribe for purposes of the sovereign immunity issue.

## CONCLUSION

I would not accord the fact of formation under state law as a limited liability company the dispositive effect that the majority does in analyzing whether U.S. Grant, LLC, should be considered to be an arm of the tribe for purposes of sovereign immunity, and I would assess several of the *Breakthrough* factors differently. However, after weighing the *Breakthrough*

factors, I conclude that on balance, the factors weigh against a determination that U.S. Grant, LLC, is an arm of the tribe and is entitled to tribal sovereign immunity.

A petition for a rehearing was denied June 15, 2012, and the petition of real party in interest for review by the Supreme Court was denied August 22, 2012, S203763.